## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA ELLIS, | ) | ***ELECTRONICALLY FILED*** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:18-cv-01549-NBF |
| | ) | |
| BNY MELLON CORP., | ) | |
| | ) | Judge Nora Barry Fischer |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Daniel A. Kadish
*Admitted Pro Hac Vice*
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY  10178
Tel:  (212) 309-6328
Fax:  (212) 309-6001
daniel.kadish@morganlewis.com

Christopher K. Ramsey (PA ID #63293)
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre, 32nd Floor
Pittsburgh, PA  15219
Tel:  (412) 560-3300
Fax:  (412) 560-7001
christopher.ramsey@morganlewis.com

*Counsel for Defendant BNY Mellon*

## TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ................................................................................................ 1

II.  SUMMARY OF MATERIAL FACTS.................................................................. 2

    A.   The Parties .................................................................................................. 2

    B.   Ellis's Facebook Post ................................................................................. 3

    C.   Reaction to the Facebook Post.................................................................... 3

    D.   The Investigation ........................................................................................ 4

    E.   The Termination.......................................................................................... 4

    F.   Ellis's Response ......................................................................................... 6

    G.   Applicable Policies ..................................................................................... 6

    H.   Other Facebook Posts Regarding Antwon Rose ........................................ 7

    I.   Plaintiff's Alleged Comparator................................................................... 8

III. SUMMARY JUDGMENT STANDARD ............................................................. 9

IV.  ARGUMENT ...................................................................................................... 9

    A.   Plaintiff Cannot Prove Her Claims Of Race Discrimination .................... 9

        1.   Ellis Cannot Make Out a *Prima Facie* Claim Of Race
             Discrimination................................................................................ 10

        2.   Plaintiff's Purported Comparators Are Inapposite ................... 11

             a.   Nicole Manns is not an appropriate comparator ........................ 12

             b.   Plaintiff does not identify any similarly situated
                 comparators treated more favorably than her ............................. 13

             c.   BNY Mellon consistently responded to each complaint
                 regarding employee social media comments about the
                 Antwon Rose protestors............................................................... 14

             d.   Plaintiff's failure to establish comparator evidence requires
                 dismissal of her claims................................................................ 15

        3.   Even If Plaintiff Could Establish A *Prima Facie* Case Of
             Discrimination, BNY Mellon Has Articulated A Legitimate,
             Nondiscriminatory Reason For Her Employment Termination.............. 16

        4.   Plaintiff Cannot Establish Pretext........................................... 17

V.   CONCLUSION.................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................9

*Barrasso v. Children's Hosp. of Pittsburgh of UPMC*,
No. 17-0267, 2019 WL 342462 (W.D. Pa. Jan. 28, 2019) ....................10

*Boyd v. Citizens Bank of Pennsylvania, Inc.*,
No. 12-0332, 2014 WL 2154902 (W.D. Pa. May 22, 2014) ................11, 12, 15, 17

*Caplan v. L Brands/Victoria's Secret Stores*,
704 F. App'x 152 (3d Cir. 2017) ...........................................................18

*Capps v. Mondelez Glob., LLC*,
847 F.3d 144 (3d Cir. 2017)...................................................................18

*Carney v. City of Dothan*,
158 F. Supp. 3d 1263, 1282 (M.D. Ala. 2016) ................................15, 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................9

*Chase v. Frontier Commcn's. Corp.*,
361 F. Supp. 3d 423, 442 (M.D. Pa. Jan. 18, 2019)................................18

*Choates v. Aker Philadelphia Shipyard*,
No. 15-3755, 2018 WL 637657 (E.D. Pa. Jan. 31, 2018).......................10

*Coulton v. Univ. of Pennsylvania*,
No. 05-1446, 2006 WL 759701 (E.D. Pa. 2006) ...................................13

*Cullison v. Dauphin Cty.*,
No. 10-0705, 2012 WL 3027776 (M.D. Pa. May 18, 2012).....................20

*Dowling v. Citizens Bank*,
295 F. App'x 499 (3d Cir. 2008) ...........................................................16

*Elston v. UPMC-Presbyterian Shadyside*,
No. 06-0329, 2007 WL 3120291 (W.D. Pa. Oct. 23, 2007)....................12

*Fuentes v. Perskie*,
32 F.3d 759 (3d Cir. 1994).................................................................17, 19

*Greer v. Mondelez Glob., Inc.*,
 590 F. App'x 170 (3d Cir. 2014) ........................................................9

*Habib v. Urban Outfitters, Inc.*,
 No. 03-1561, 2004 WL 765119 (E.D. Pa. Apr. 1, 2004).........................................10

*Hendricks v. Pittsburgh Pub. Sch.*,
 No. 13-0491, 2014 WL 4641167 (W.D. Pa. Sept. 16, 2014)...........................................10, 11

*Howard v. Blalock Elec. Serv., Inc.*,
 742 F. Supp. 2d 681 (W.D. Pa. 2010)...............................................................11, 15

*Kopko v. Lehigh Valley Health Network*,
 No. 14-1290, 2016 WL 6442062 (E.D. Pa. Oct. 31, 2016),
 *aff'd*, 777 F. App'x 768 (3d Cir. 2019)......................................................18

*McDonnell Douglas Corp. v. Green*,
 411 U.S. 792 (1973)..........................................................................9, 19

*Moore v. Park Ctr., Inc.*,
 830 F. Supp. 2d 592 (N.D. Ind. 2011) ........................................................18

*Moussa v. Commw. of Pa. Dep't of Pub. Welfare*,
 289 F. Supp. 2d 639 (W.D. Pa. 2003)...........................................................12

*Opsatnik v. Norfolk S. Corp.*,
 335 F. App'x 220 (3d Cir. 2009) ..............................................................13

*Pederzolli v. Sonneborn, Inc.*,
 No. 13-0438, 2014 WL 6953119 (W.D. Pa. Dec. 8, 2014) ....................................16

*Stahlnecker v. Sears*,
 No. 08-0681, 2009 WL 661927 (E.D. Pa. Mar. 11, 2009) ....................................16

*Stanziale v. Jargowsky*,
 200 F.3d 101 (3d Cir. 2000)....................................................................17

*Waldron v. SL Indus., Inc.*,
 56 F.3d 491 (3d Cir. 1995).....................................................................20

*Woodson v. Scott Paper Co.*,
 109 F.3d 913 (3d Cir. 1997)..................................................................16, 17

**Statutes**

29 U.S.C. § 1981 ...........................................................................9

Civil Rights Act Title VII .................................................................9

**Other Authorities**

Fed. R. Civ. P. 56(a) ...................................................................................................................1, 9

LCvR 56...........................................................................................................................................1

Pursuant to Federal Rule of Civil Procedure 56 and LCvR 56, Defendant The Bank of New York Mellon Corporation[1] ("BNY Mellon" or the "Company") submits this Memorandum of Law in Support of its Motion for Summary Judgment on all counts of the Complaint filed by Plaintiff Lisa Ellis ("Plaintiff" or "Ellis").

## I.    <u>INTRODUCTION</u>

In response to an article about a local councilman who was arrested for injuring multiple people by driving his car through a crowd protesting the killing of young man by a police officer, Ellis wrote on Facebook: "Total BS.  He should have taken a bus to plow thru [sic]."  In addition to the shockingly poor judgment Ellis demonstrated in writing a post advocating violence, she violated multiple Company policies relating to social media, good judgment and appropriate conduct.  BNY Mellon terminated Ellis's employment shortly after it became aware of her post through multiple complaints made to the Company by non-employee members of the public.

Ellis now claims her termination was discriminatory based on her race (white).  However, there is no evidence to support her unsubstantiated and conclusory allegations.  Rather, the undisputed facts reveal that Ellis identified herself as an employee of BNY Mellon on her Facebook profile, that she made the post quoted above, and that numerous people submitted complaints to BNY Mellon concerning the "vile and vicious" language of Ellis's post that "advocates for mass murder against nonviolent protestors."  Promptly upon receipt of those complaints, BNY Mellon investigated Ellis's posts, interviewed Ellis, reviewed applicable policies, and decided to terminate Ellis as a result of her significant policy violations and the fact that her action created reputational risk for the Company.

---

[1]  Defendant was incorrectly named as BNY Mellon Corp. in the Complaint.

Ellis cannot establish a *prima facie* case of race discrimination in this matter because she cannot show that her employment termination occurred under circumstances giving rise to an inference of discrimination.  Even if she could show a *prima facie* case, BNY Mellon had legitimate, nondiscriminatory reasons to end her employment: she violated BNY Mellon policies and expectations by advocating for violence in her post.  Thus, her employment termination was not pretext for intentional race discrimination.  Indeed, Ellis admitted that she has no evidence that the investigators, the managers who made the decision to end her employment, or anyone else at BNY Mellon discriminated against her in any way, and she cannot cite to any actual comparator who was similarly-situated and treated differently.

For these reasons, as set forth in greater detail below, BNY Mellon is entitled to summary judgment on all counts of Plaintiff's Complaint.

## II.   SUMMARY OF MATERIAL FACTS[2]

### A.   The Parties

BNY Mellon provides a wide array of financial services to corporations and institutions around the world.  SMF ¶ 1.  BNY Mellon employed Ellis on an at-will basis beginning on July 27, 2015 as a Control Group Project Manager in the Wealth Management Department.  SMF ¶ 2.

Rick Adams ("Adams"), Chief Control Officer – Wealth Management, was the head of Ellis's department throughout her employment.  SMF ¶ 4.  Adams also interviewed Ellis and approved her hiring.  SMF ¶ 4.  Adams reported to Erich Smith ("Smith"), Chief Operating Officer – Wealth Management.  SMF ¶ 6.  Ellis, Adams and Smith are all white.  SMF ¶¶ 5, 53.

---

[2]  This brief summary of material facts is based upon BNY Mellon's Concise Statement of Material Facts filed herewith, which BNY Mellon incorporates herein by reference.  Other facts are discussed in Section III of this Memorandum of Law, and citations are to BNY Mellon's Concise Statement of Material Facts ("SMF ¶ ___"), which, in turn, contains citations to the records that are contained in BNY Mellon's Appendix of Record Materials in Support of its Motion for Summary Judgment.

B.      **Ellis's Facebook Post**

The facts that preceded Ellis's termination of employment have been widely reported in the media.  After a police shooting in June 2018 that unfortunately resulted in the death of an African-American teenager, Antwon Rose, crowds of people demonstrated around Pittsburgh. SMF ¶¶ 8-9.  During one of these gatherings, a local councilman drove his car into a crowd of protestors, causing multiple injuries, then fled the scene.  SMF ¶ 10.  Police arrested the councilman and charged him with reckless endangerment and multiple traffic violations, resulting in extensive media coverage in late June 2018.  SMF ¶ 10.  In response to an article regarding the councilman's arrest, on June 30, 2018, Ellis publicly posted on Facebook: "Total BS.  Too bad he didn't have a bus to plow thru [sic]" (the "post").  SMF ¶ 11.  In her public Facebook profile, Ellis identified herself as an employee of BNY Mellon.  SMF ¶¶ 12-13.

C.      **Reaction to the Facebook Post**

Within 48 hours of Ellis's post, numerous individuals, each of whom was unaffiliated with BNY Mellon, contacted BNY Mellon to complain about the violent nature of Ellis's comment.  SMF ¶ 14.  Individuals messaged BNY Mellon directly through its Facebook page, tagged BNY Mellon on Facebook, submitted complaints through BNY Mellon's ethics hotline, and even attempted to call the CEO and Chief Human Resources Officer directly.  SMF ¶ 15.  As these messages make clear, multiple members of the public understandably believed Ellis's comment was disturbing.  SMF ¶¶ 16(a)-(e).  A few excerpts of these messages are below:

- "A man runs over protestors in Pittsburgh and gets charged for his crime.  This is the VP of BNY Mellon's response 'total b.s., too bad he didn't have a bus to plow through.'  Does BNY Mellon allow their employees to promote attempted vehicular homicide?  Does this represent your core values?  If No, what is the policy on social media presence of professionals that represent your company?  Answers please!!"  SMF ¶ 16(a).
- "Our community is in a lot of pain and are exercising our right to protest.  Recently during one of the protests a man felt he could run through the crowd and hurt someone. In light of all the pain, one of your employees, Lisa A. Ellis, made disturbing and

3

inhuman posts regarding the man's actions.  I have added the screen shots.  BNY Mellon, is this how you allow your employees to act and represent your community?"  SMF ¶ 16(b).

- "Good morning, have you seen the vile and vicious comments from one of your VPs, Lisa A Ellis.  Ms. Ellis believes in animal rights, However, the rights of peaceful demonstrators does not exist.  'Too bad he didn't have a bus to plow thru', I guess that says it all?"  SMF ¶ 16(c).
- "I need to know if this is the morals and values of your bank.  For someone so high up the chain to feel this way, I'm disgusted and need answers.  I was going to apply for a job, but after seeing the view of this employee I'm second guessing things."  SMF ¶ 16(d).

Although BNY Mellon does not monitor the social media posts of its employees, these various messages flagging Ellis's post quickly made BNY Mellon aware of it.  SMF ¶ 17.

### D.    The Investigation

On Monday morning, July 2, 2018, the first business day after Ellis' post, BNY Mellon's Corporate Communications group informed Jack Cameron ("Cameron"), BNY Mellon's Global Head, HR Governance and Employee Relations, about Ellis's post.  SMF ¶ 18.  Cameron directed Thomas Galante ("Galante"), Vice President, Human Resources-Employee Relations, to investigate the post.  SMF ¶ 19.  Galante partnered with Cindy Wurzbacher ("Wurzbacher"), Senior Human Resources Business Partner, to conduct the investigation.  SMF ¶ 20.  Galante and Wurzbacher interviewed Ellis that morning, during which Ellis confirmed that she made the post and that she listed BNY Mellon as her employer on Facebook.  SMF ¶¶ 21-23.  Galante and Wurzbacher shared that this was a serious issue and that disciplinary action up to and including ending her employment could occur.  SMF ¶ 25.

### E.    The Termination

Later that day, Galante and Wurzbacher conducted a call with Cameron and the senior managers in Ellis's line of business, Adams and Smith.  SMF ¶ 27.  As the business line managers, Adams and Smith were responsible for making the decision regarding if and how to

discipline Ellis.[3]  SMF ¶ 35.  During this call, Galante and Wurzbacher shared their findings, which included the content of Ellis's post, her confirmation that she had made the post, the fact that BNY Mellon had already received multiple external complaints about Ellis's post, and their opinion that the post itself was highly inappropriate as it appeared intended to incite violence. SMF ¶¶ 28, 31-32.  Galante and Wurzbacher commented that the post advocated violence by encouraging the use of a bus to plow through a crowd of people, in relation to a real event that had just occurred in which several people were injured.  SMF ¶¶ 31, 33.

Galante and Wurzbacher also opined that Ellis's post violated multiple policies, including the Code of Conduct and Social Media Policy.  SMF ¶¶ 33-34.  The call participants expressed concern that Ellis's post demonstrated extremely poor judgment and could create a reputational risk for BNY Mellon, evidenced in part by the volume of complaints BNY Mellon received. SMF ¶¶ 29-30.  Based on the information provided by Wurzbacher and Galante along with the recommendations from Human Resources (Wurzbacher) and Employee Relations (Cameron and Galante) in support of employment termination (SMF ¶ 34), Adams and Smith made the decision to end Ellis's employment.  SMF ¶ 35.  The decision was unanimous and no one on the call suggested that lesser discipline should be issued.  SMF ¶ 36.  Notably, each person involved in the investigation and the decision to end Ellis's employment is white (SMF ¶ 53), and race was not referenced in any way or taken into account whatsoever by any of these individuals.

On July 3, 2018, Adams informed Ellis that BNY Mellon decided to end her employment because she violated the Code of Conduct and Social Media Policy by engaging in conduct that showed poor judgment and that harmed or could harm BNY Mellon's reputation.  SMF ¶¶ 39-40.

---

[3] Contrary to the allegations in the Complaint, Nicole Manns ("Manns") was not involved whatsoever in the decisions to investigate or terminate Ellis.  SMF ¶¶ 34-35.

F.      **Ellis's Response**

Following her separation from employment, Ellis admitted that her comment was a "stupid mistake," "poor judgment," was disrespectful, and was subject to various interpretations. SMF ¶ 41. Ellis specifically conceded that her comment could be interpreted as encouraging violent behavior. SMF ¶ 42. Ellis also confirmed that she wanted people to know she supported the councilman's behavior, even though she agreed that intentionally driving into a crowd of people is not okay and "it is not something that should be encouraged in any way." SMF ¶¶ 43-44. Ellis also stated that she did not think Adams would discriminate against her, and she acknowledged that no one at BNY Mellon had never done anything discriminatory to her. SMF ¶ 52. Finally, Ellis admitted that she knew BNY Mellon thought she violated company policies at the time of her termination from employment. SMF ¶ 51.

G.      **Applicable Policies**

Throughout the duration of Ellis's employment, BNY Mellon maintained an employee Code of Conduct (SMF ¶ 45) and Social Media Policy (SMF ¶ 47). The Code of Conduct, entitled "Doing What's Right," broadly describes BNY Mellon's values and emphasizes the importance of displaying good judgment. SMF ¶ 45. The Code of Conduct specifically states:

- The Code itself cannot address every possible situation. We expect all employees to exercise good judgment, using the Code as a primary resource to better understand our principles of ethical behavior, and to seek help when unsure of the right course of action. SMF ¶ 46(a)
- At BNY Mellon, 'Doing What's Right' Means [d]emonstrating respect for our clients, communities and one another (SMF ¶ 46(b)).
- Key principles of Our Code: Respecting Others [and] Supporting Our Communities. SMF ¶ 46(c).
- Remember, ignorance or a lack of understanding is not an excuse for violating the Code. The company has established many resources to help deal with questions you may have regarding compliance with the Code. You're expected to take advantage of those resources. SMF ¶ 46(d).

The Social Media Policy applies to all employees, contractors, and consultants (SMF ¶ 47) and specifically addresses the use of Facebook, along with all non-BNY Mellon applications that facilitate communication over the internet. The Social Media Policy states:

- This Use of External Social Media Policy (the "Policy") sets rules and offers guidelines regarding (i) employees' personal use of external social media; and (ii) use of external social media on behalf of BNY Mellon. SMF ¶ 48(a).
- This Policy applies to all BNY Mellon employees, contractors and consultants. The term "external social media" as used in this Policy means non-BNY Mellon owned or operated websites, applications, services, or tools that facilitate communication over the internet. This includes . . . Facebook." SMF ¶ 48(b).
- [E]mployees' use of external social media must also comply with BNY Mellon's Code of Conduct. SMF ¶ 48(c).
- Be respectful and remain aware of the BNY Mellon policies prohibiting unlawful harassment and discrimination and be sure that your postings are in compliance with these policies. SMF ¶ 48(e).
- The above restrictions are consistent with the key principles of BNY Mellon's **Code of Conduct**. Your use of external social media that harms or impairs BNY Mellon's financial or professional reputation or is damaging to BNY Mellon in any other respect may result in consequences affecting your employment status. You may be subject to disciplinary action, up to and including termination of employment, if you violate this Policy. SMF ¶ 48(f).

Ellis understood that the Code of Conduct and Social Media Policy applied to her behavior, including her posts on Facebook. SMF ¶¶ 49-50.

## H.    Other Facebook Posts Regarding Antwon Rose

Separate from Ellis's post, BNY Mellon received complaints regarding two other comments by its personnel regarding the Antwon Rose shooting and subsequent demonstrations. The first complaint addressed a Facebook comment made by Aaron Schall ("Schall"), a white BNY Mellon employee, who posted:

> Yeah I know. It's like enough with the protesting already! They made their point loud and clear. We get the message. Protesting aggressively and damaging cars being destructive isn't going to bring back that 17 year old kid's life. Causing riots is not making those protestors any better than that cop out of line.
> SMF ¶¶ 64-65.

After learning of this complaint on or around July 3, 2018, BNY Mellon investigated the complaint and determined that the post warranted a discussion with Schall.  SMF ¶ 66.  The discussion included reminding Schall about the Social Media Policy.  SMF ¶ 67.  Schall was not subject to further discipline.  SMF ¶ 68.

The second complaint addressed a Facebook comment made by Brandon Nichols ("Nichols"), an African-American contractor providing services to BNY Mellon.  SMF ¶¶ 59-60.  Nichols wrote: "Good I hope they hit him and that pig."  SMF ¶¶ 61-62.  This was in response to news reports on March 23, 2019, reporting that after the police officer who was involved in the Antwon Rose shooting was acquitted of all criminal charges, someone shot multiple bullets into the office of his attorney, Patrick Thomassey.  SMF ¶¶ 60-61.  BNY Mellon interpreted this post to be advocating violence and specifically expressing a desire for both the police officer and his attorney to get shot.  SMF ¶ 63.  Based on the violent nature of this comment, BNY Mellon immediately terminated Nichols's assignment.  SMF ¶ 63.

## I.      Plaintiff's Alleged Comparator

In discovery, Ellis focused on one person whom she believed exhibited social media behavior similar to her own.  Specifically, she found a social media post made on November 20, 2018 by Nicole Manns ("Manns"), an African-American employee of BNY Mellon.  A personal friend of Ellis's, Gregg Phillips, complained to BNY Mellon about it.  SMF ¶¶ 54-55.  In this post, Manns commented on an article about domestic violence murder and wrote:

> I was always afraid to have a son because it always seemed that everyone was trying to kill black men (and so many are trying to kill them).  It seemed that girls were easier, safer.  Sure, they could get into some trouble but it didn't feel like people were actively trying to kill them.  Well, Sandra Bland and others brought so much to light about police brutality and this story reminds us that one sick, angry piece of trash can take your daughter away from you.  A man who raises his hand to a woman in anger should pick a bridge and step right tf off.
> SMF ¶54.

In this post, Manns actually advocated for preventing domestic violence, opposed violence, and did not urge any particular individual to commit suicide.  SMF ¶ 56.  After learning about this post, BNY Mellon advised Manns to be mindful of what she posted online and the public nature of her posts, but did not impose any discipline.  SMF ¶ 57.

## III.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate when the moving party shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In discrimination claims, because the ultimate burden remains at all times with the plaintiff, a defendant is not required to negate a plaintiff's claims of discrimination in order to be entitled to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A party seeking summary judgment cannot rely on mere allegations to meet this burden. Rather, he or she must present actual evidence that creates a genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  By contrast, the opposing party need only point out that there is an absence of evidence to support the plaintiff's claims or offer affirmative evidence that demonstrates that the plaintiff cannot prove his case.  *See Celotex*, 477 U.S. at 322.  Here, BNY Mellon can do both.

## IV.   <u>ARGUMENT</u>

### A.   **Plaintiff Cannot Prove Her Claims Of Race Discrimination.**

Ellis alleges that her employment termination was based on her race (white) in violation of Title VII of the Civil Rights Act ("Title VII") and 29 U.S.C. § 1981 ("Section 1981").  Title VII and Section 1981 claims are substantively identical, and both claims are subject to the burden-shifting analysis originally established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Greer v. Mondelez Glob., Inc.*, 590 F. App'x

9

170, 172 (3d Cir. 2014) ("Because the substantive elements of an employment discrimination claim brought under § 1981 are identical to those brought under Title VII, § 1981 claims are also governed by the McDonnell Douglas burden-shifting framework.").

Under this framework, Ellis first must establish a *prima facie* case of discrimination.  The burden then shifts to BNY Mellon to articulate a legitimate, nondiscriminatory reason for its actions.  Once done, the burden shifts back to Ellis to prove by a preponderance of the evidence that the legitimate reasons articulated by BNY Mellon are a pretext for discrimination.  *See Hendricks v. Pittsburgh Pub. Sch.*, No. 13-0491, 2014 WL 4641167, at *5 (W.D. Pa. Sept. 16, 2014).  Conclusory allegations are insufficient to prove a discrimination claim.  *Choates v. Aker Philadelphia Shipyard*, No. 15-3755, 2018 WL 637657, at *9 (E.D. Pa. Jan. 31, 2018) ("Merely reciting that race was the reason [for the adverse action decision] does not make it so."); *see also Barrasso v. Children's Hosp. of Pittsburgh of UPMC*, No. 17-0267, 2019 WL 342462, at *8 (W.D. Pa. Jan. 28, 2019) ("in the context of employment discrimination claims, conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment.") (internal quotation omitted); *Habib v. Urban Outfitters, Inc.*, No. 03-1561, 2004 WL 765119, at *7 (E.D. Pa. Apr. 1, 2004) ( "[w]here a plaintiff relies upon his own beliefs . . . and fails to present any factual evidence linking his termination to his . . . protected class, he has failed to make out a *prima facie* case . . . .").  Ellis is unable to make out a claim for race discrimination under this rubric because she cannot establish a *prima facie* case.  Even if she could, BNY Mellon has articulated a legitimate, nondiscriminatory reason for its actions, and there is no evidence of pretext that could overcome that articulated reason.

### 1.    Ellis Cannot Make Out a *Prima Facie* Claim of Race Discrimination.

"In order to establish a prima facie case of race discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered

an adverse employment action; and (4) similarly situated persons who are not members of her protected class were treated more favorably or that the circumstances of her termination give rise to an inference of discrimination." *Boyd v. Citizens Bank of Pennsylvania, Inc.*, No. 12-0332, 2014 WL 2154902, at *25 (W.D. Pa. May 22, 2014); *Hendricks,* 2014 WL 4641167, at *4.

Summary judgment is warranted here because Ellis cannot meet her burden under the fourth prong of the *prima facie* test to establish that her employment ended under circumstances that give rise to an inference of discrimination.  Rather, the undisputed evidence demonstrates that BNY Mellon terminated Ellis's employment solely as a result of her posting an incredibly violent comment on Facebook and that the BNY Mellon Human personnel who discussed the post and approved employment termination did not discuss race at any point.  SMF ¶¶ 35, 37-38. Indeed, the circumstances show that ending Ellis's employment was the appropriate response to such an offensive post.  Even Ellis conceded that her post showed poor judgment, lack of respect, and could be interpreted as encouraging violence.  SMF ¶¶ 41-42.  These were the very reasons for her employment ending.  SMF ¶ 37.  Based on these facts, Ellis cannot demonstrate that her employment termination occurred under circumstances giving rise to an inference of race discrimination and thus, she cannot make a *prima facie* case.

## 2.    Plaintiff's Purported Comparators Are Inapposite.

Ellis has not established any evidence that she was treated differently from members of a different class because of her race (white).  She can point to no comparators that help her *prima facie* case.  Courts in the Third Circuit routinely look for comparator evidence when determining if a plaintiff can establish a *prima facie* case of race discrimination.  *See Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 701-702 (W.D. Pa. 2010) ("At the *prima facie* stage, the central focus is on whether an employer has treated an employee less favorably than others on the basis of an illicit discriminatory criterion. . . . The most common way in which a plaintiff can establish

a *prima facie* case of illegal discrimination is to show that he or she has received less favorable treatment than similarly situated employees who did not share his or her statutorily-protected trait.") (internal quotations omitted); *Boyd*, 2014 WL 2154902, at *26 ("Similar to Plaintiff's age discrimination claim, the dispute centers on the fourth prong.  Defendant argues that Plaintiff cannot demonstrate that similarly situated employees who were not members of the protected class were treated more favorably.  The Court agrees.").

a.    <strong>Nicole Manns is not an appropriate comparator.</strong>

BNY Mellon expects that Ellis will attempt to argue that her own termination was based on race because Nicole Manns, an African-American employee, wrote a potentially controversial message on Facebook and BNY Mellon did not terminate her employment.  This argument fails, however, because Manns wrote this post over four months after Plaintiff's employment ended and it is notably dissimilar to Ellis's post.  In Manns's post, she wrote that a hypothetical man who raises his hand to a woman in anger should find a bridge and step right off.  SMF ¶¶ 54, 56.  Mann's post does not advocate for violence against any individual or any group of people in particular.  To the contrary, the point of Mann's post was to advocate against domestic violence, essentially the very opposite message of what Ellis wrote.  Manns, therefore, is not similarly situated to Ellis because her post was not comparable.

Moreover, Manns is dissimilar to Ellis because she worked in an entirely different department than Ellis with different managers than those in Ellis's department.  SMF ¶ 58.  Adams and Smith, who decided to terminate Ellis, did not manage Manns (SMF ¶ 58) and there is no evidence that they were even aware of any posts by Manns.  For this additional reason, Manns is not a proper comparator.  *See Moussa v. Commw. of Pa. Dep't of Pub. Welfare*, 289 F. Supp. 2d 639, 652 (W.D. Pa. 2003) (employee who engages in similar conduct, but whose actions are not known to decision-makers, cannot serve as comparator); *see also Elston v.*

12

*UPMC-Presbyterian Shadyside*, No. 06-0329, 2007 WL 3120291, at *7 (W.D. Pa. Oct. 23, 2007) (explaining "Defendant correctly points out that to be a valid comparator, the co-worker must have been disciplined by the same decision-maker" and holding "[i]n summary, Elston has failed to establish the existence of any valid comparators.  There is simply no basis to support an inference of race discrimination"); *Coulton v. Univ. of Pennsylvania*, No. 05-1446, 2006 WL 759701, at *7 n.3 (E.D. Pa. 2006) ("'[W]hen employment decisions concerning different employees are made by different supervisors, such decisions are seldom sufficiently comparable to raise an inference of discrimination because different supervisors may exercise their discretion differently.'") (internal quotation omitted).

> **b.**     **Plaintiff does not identify any similarly situated comparators treated more favorably than her.**

Ellis also falls far short of showing that similarly situated individuals were treated more favorably because she does not identify a single individual who had the same supervisors as a potential comparator and she does not identify a single post made by anyone else, regardless of race, which is comparable to her own.  *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222-223 (3d Cir. 2009) (upholding a summary judgment decision because Plaintiff failed to "present evidence suggesting a link between the purported comparators and the motivations of the decision-makers who terminated [Plaintiff]").  In *Opsatnik*, the Third Circuit explained:

> While similarly situated does not mean identically situated, the plaintiff must nevertheless be similar in all relevant respects.  Which factors are relevant is determined by the context of each case, but often includes a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.
>
> *Id.* (internal quotations omitted).

      **c.**     **BNY Mellon consistently responded to each complaint regarding employee social media comments about the Antwon Rose protestors.**

Moreover, although not cited by Ellis and although not in the same department as Ellis or any of her managers, there are only two other individuals known to BNY Mellon who made posts that were arguably similar to Ellis's post: Schall, a white employee; and Nichols, an African-American contractor. Schall and Nichols each posted about the protests or legal proceedings that followed the Antwon Rose shooting. SMF ¶¶ 60, 64-65. BNY Mellon's responses to those posts show that BNY Mellon's decisions were unrelated to race and instead, were based on the content of each post.

Specifically, after receiving a complaint about the post Schall wrote commenting on the protestors following the Antwon Rose shooting, BNY Mellon determined that he was not advocating violence against the protesters or anyone else. SMF ¶ 67. Thus, BNY Mellon reminded him about the Social Media Policy and to be aware of what he posted publicly. SMF ¶ 67. On the other hand, after BNY Mellon became aware of a Facebook post written by Nichols, an African-American contractor, who stated in the post that he hoped the gunshots fired into the office of the attorney who represented the police officer who shot Antwon Rose hit both the attorney and the police officer, BNY Mellon immediately terminated Nichols's assignment. SMF ¶ 63. Nichols's post, like Ellis's, advocated violence. BNY Mellon's responses were appropriate given the nature of each post. If BNY Mellon had a bias against white employees, as Ellis alleges it does, it would have terminated Schall's employment and retained Nichols. Rather, BNY Mellon's thoughtful and consistent responses to complaints about allegedly inappropriate posts, regardless of the race of the person who made the post, refutes Ellis's claim that her termination was based on her race.

**d.     Plaintiff's failure to establish comparator evidence requires dismissal of her claims.**

Courts have recognized that the absence of similarly situated employees who were treated more favorably and the absence of circumstances raising the inference of discrimination are fatal to a plaintiff's *prima facie* showing.  For example, in *Carney v. City of Dothan*, 158 F. Supp. 3d 1263, 1282 (M.D. Ala. 2016), a factually and legally similar case, the court granted summary judgment in favor of the defendant because the plaintiff failed to make a *prima facie* case.  While not binding on this Court, *Carney* is well-reasoned and persuasive.  There, the court explained:

> First, Carney has failed to make out a *prima facie* case of discrimination.  Specifically, she has not shown that the Department treated similarly situated white officers more favorably.  The Department suspended Carney because it determined that her Facebook comments, which it determined to be supportive of [confessed killer]'s murderous actions, violated its social media policies.  Carney complained that other officers posted on social media in violation of the policy, but the Department investigated those other comments and determined that they were not violative of city policy.  These officers cannot be considered similarly situated because their posts were not objectionable in the way Carney's posts were.  The undisputed evidence establishes that the Department did in fact discipline other officers, both black and white, for posts that did violate its policies.
> *Id.* at 1282.

Here, Ellis offers nothing more than her own conclusory opinion that her race impacted the decision to terminate her employment.  Ellis's subjective opinion is not enough to sustain this action.  *See Howard*, 742 F. Supp. 2d at 702 ("An inference of race-based discrimination cannot arise simply from an employee's subjective belief that his or her race somehow influenced the challenged employment action").  As in *Carney*, it is undisputed that BNY Mellon investigated complaints of violations of its social media policy and disciplined white and nonwhite employees when it found violations.  This rebuts any attempt by Ellis to establish a *prima facie* case.

Because Ellis's effort to show that an employee outside of her race engaged in similar conduct and was treated more favorably fails, her *prima facie* case fails as well.  *See Boyd*, 2014 WL 2154902, at *26 ("Plaintiff has failed to present sufficient facts from which a reasonable jury

could conclude that she was similarly situated to these employees since they did not engage in the same or comparable offending conduct for which Plaintiff was terminated.").  Her claims should be dismissed for failure to establish a *prima facie* case of race discrimination.

### 3. Even If Plaintiff Could Establish A *Prima Facie* Case Of Discrimination, BNY Mellon Has Articulated A Legitimate, Nondiscriminatory Reason For Her Employment Termination.

Even if Ellis could establish a *prima facie* case, BNY Mellon has articulated a legitimate, nondiscriminatory reason for its actions.  BNY Mellon terminated Ellis's employment because Adams and Smith concluded following a review of the post, the complaints about the post, and applicable policies, that Ellis violated the Code of Conduct and Social Media Policy by writing a post on Facebook that was offensive in nature, advocated violence, and demonstrated extremely poor judgment.  SMF ¶¶ 33-35.  Further, Adams and Smith believed that Ellis's post exposed BNY Mellon to reputational risk.  SMF ¶ 37.  This is unquestionably a legitimate, nondiscriminatory reason to terminate employment.  *See, e.g., Pederzolli v. Sonneborn, Inc.*, No. 13-0438, 2014 WL 6953119, at *9 (W.D. Pa. Dec. 8, 2014) ("A violation of workplace conduct policy is a legitimate, nondiscriminatory reason for termination."); *Stahlnecker v. Sears*, No. 08-0681, 2009 WL 661927, at *5 (E.D. Pa. Mar. 11, 2009) ("It is well-settled that a violation of company policy, even an unintentional violation, is a legitimate, nondiscriminatory reason to terminate employment.") (*citing Dowling v. Citizens Bank*, 295 F. App'x 499, 503 (3d Cir. 2008) ("[Defendant] need not show that [plaintiff] intentionally violated company policy in order to have a legitimate reason for firing her . . . [s]o long as [defendant's] decision was not motivated by discriminatory animus, we defer to it.")) (internal citation omitted).  BNY Mellon's reasons for terminating Ellis's employment easily satisfy its relatively light burden at this stage.  *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997) ("The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the

discharge; the defendant need not prove that the articulated reason actually motivated the discharge.") (citation omitted).

### 4.   Plaintiff Cannot Establish Pretext.

Once BNY Mellon articulates a legitimate, nondiscriminatory reason for its actions, Ellis must prove that BNY Mellon's reason was a pretext for discrimination.  Ellis must establish "both that the reason was false, and that discrimination was the real reason" for BNY Mellon's decision.  *Woodson*, 109 F.3d at 920 n.2 ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.") (internal quotation omitted); *see also Boyd*, 2014 WL 2154902 at *19 ("In order to defeat Defendant's summary judgment motion, Plaintiff must point to some evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action'") (quoting *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000)). This is a "difficult burden," which requires Ellis to put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [BNY Mellon's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Fuentes v. Perskie*, 32 F.3d 759, 764-765 (3d Cir. 1994) (internal quotations omitted).  Ellis cannot meet this burden.

Ellis cannot refute that the individuals who made the decision to end her employment believed, based on the reports they received from the investigators, that Ellis's post was violent in nature, violated the Code of Conduct and Social Media Policy, and demonstrated exceedingly poor judgment.  Notably, Ellis specifically conceded during her deposition that a possible reasonable interpretation of her post was that it encouraged violent behavior, particularly because she referred to an actual event of someone driving their car through a crowd that could have been

even more violent if the person drove a bus instead.  SMF ¶ 42.  She further admitted that she actually did mean it literally when she said it was "BS" that the councilman was arrested for running through the crowd and that she supported his actions.  SMF ¶¶ 43-44.

There is no evidence that Adams or Smith did not honestly believe the report from the investigators about Ellis's Facebook post or how it violated BNY Mellon policy and expectations.  Moreover, under the law, even if Adams's and Smith's reasons for ending Ellis's employment were "mistaken, ill-considered or foolish, so long as [they] honestly believed those reasons, pretext has not been shown."  *Kopko v. Lehigh Valley Health Network*, No. 14-1290, 2016 WL 6442062, at *8 (E.D. Pa. Oct. 31, 2016) *aff'd*, 777 F. App'x 768 (3d Cir. 2019) (quoting *Moore v. Park Ctr., Inc.,* 830 F. Supp. 2d 592, 604 (N.D. Ind. 2011)).  *See also Chase v. Frontier Commcn's Corp.*, 361 F. Supp. 3d 423, 442 (M.D. Pa. Jan. 18, 2019) ("Plaintiff needs to show more than mistake to show legally significant pretext: the issue of pretext does not address the correctness of the reason offered; '[r]ather, it addresses the issue of whether the employer honestly believes in the reasons it offers.'") (quoting *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017)).

In a similar matter, *Caplan v. L Brands/Victoria's Secret Stores, LLC*[4], the employer terminated the plaintiff, a white female manager, after investigating an anonymous complaint about inappropriate Facebook posts she had made, including a post that contained an image of a person wearing a "Ku Klux Klan-reminiscent" robe.  210 F. Supp. 3d 744, 750 (W.D. Pa. 2016). When analyzing the employee's argument that the employer's policy violation rationale for termination was a pretext for discrimination, District Judge Conti explained:

---

[4]  This decision, granting summary judgment for Defendant's, was affirmed by the Third Circuit in 2017.  *See Caplan v. L Brands/Victoria's Secret Stores*, 704 F. App'x 152 (3d Cir. 2017).

> There is no dispute in the record that Williams [the decisionmaker], and the individuals with whom he consulted about the ethics complaint, agreed that both Facebook posts were racially derogatory and offensive and alone justified Caplan's termination if Caplan admitted to making them.  Caplan's insistence that she intended the posts to be a protest against racism and that the posts were not "actually offensive" are inapposite.  What matters is the perception of the decisionmaker, not the intent or personal opinion of the employee; the question, after all, is whether the employer acted with a retaliatory motive instead of its proffered motive in making its employment decision.  Even if Williams', and the others', belief was wrong, ill-informed, or mistaken, if it was genuine, honestly-held, and reasonable it cannot qualify as evidence of pretext.
>
> * * *
>
> Despite Caplan's contention, she produces no evidence that [defendant] violated its own anti-discrimination policies by deciding to terminate her.  Caplan's entire argument rests upon the premise that [the decision-maker], and the others with whom he consulted, reached the wrong conclusion about the intent and meaning behind the two Facebook posts at issue.  Even if Caplan is correct, however, under prevailing legal authorities, this is not probative of pretext.

*Id.* at 766-67 (internal citations omitted).  The court awarded summary judgment to the defendant as the plaintiff could not demonstrate that the decision-makers' belief that her social media posts violated company policy was a pretext for retaliation.  *Id.* at 755; *see also Carney*, 158 F. Supp. 3d at 1282 ("[A]ssuming arguendo that Carney establishes a *prima facie* case, the City of Dothan is entitled to summary judgment based on its legitimate, nondiscriminatory reason for disciplining Carney . . . [as] the Department determined, after a full investigation, that Carney's Facebook commentary ran afoul of its established policies.  This is sufficient to constitute a legitimate, nondiscriminatory reason under the *McDonnell Douglas* framework.").

Here, even assuming *arguendo* that Ellis were able to establish a *prima facie* case, the Court should grant BNY Mellon's motion for summary judgment as she is unable to establish that its reasons for employment termination are pretextual.  Ellis has no evidence that either Adams's or Smith's belief that Ellis violated BNY Mellon's Code of Conduct or its Social Media Policy is a pretext for discrimination.  Rather, Ellis admits that she never felt discriminated against throughout the duration of her employment at BNY Mellon and that she never observed

or heard Adams or Smith engage in any type of discriminatory behavior or make any race-related comments.  SMF ¶ 52.  She further has no evidence that anyone at BNY Mellon considered her race, or the race of anyone else, when deciding to investigate her post, when conducting the investigation, or when making the decision to terminate her employment.  SMF ¶¶ 51-52.

In addition, the fact that one of the decision-makers, Adams, was involved in both the decision to hire Ellis in 2015 and the decision to terminate her employment in 2018 further rebuts any inference of discrimination.  *See Cullison v. Dauphin Cty.*, No. 10-0705, 2012 WL 3027776, at *14 (M.D. Pa. May 18, 2012) ("Moreover, inasmuch as [Plaintiff's manager] was the person who made both the decision to hire [Plaintiff] as well as the decision to fire him, defendants contend there is a presumption against a discriminatory animus being drawn.  Indeed, the Third Circuit has noted that such evidence, while not dispositive, may be relevant to show that no discrimination occurred.") (citing *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 496 n.6 (3d Cir. 1995)).

Further, Ellis cannot show pretext by citing to any alleged comparators.  As discussed in Section IV(2)(c), *supra*, Manns is not an appropriate comparator given the vastly different nature of her post and the fact that she worked under different managers.  Moreover, BNY Mellon's responses to posts related to the Antwon Rose aftermath by Ellis, Schall and Nichols show consistent actions by the Company based on the nature of the posts and without regard for the race of the individual who made each post.  *See* Section IV(2)(c), *supra*.  These actions refute any claim of pretext by Ellis.  There are no facts to support Ellis's race discrimination claims, which therefore, fail as a matter of law and should be dismissed.

V.       **CONCLUSION**

For all of the reasons set forth above, BNY Mellon respectfully requests that the Court grant Defendant's Motion for Summary Judgment and dismiss Plaintiff's Complaint in its entirety.

October 16, 2019                              Respectfully submitted,

                                             s/ *Daniel A. Kadish*
                                             Daniel A. Kadish *(Admitted Pro Hac Vice)*
                                             MORGAN, LEWIS & BOCKIUS LLP
                                             101 Park Avenue
                                             New York, NY  10178
                                             Tel:  (212) 309-6328
                                             Fax:  (212) 309-6001
                                             daniel.kadish@morganlewis.com

                                             Christopher K. Ramsey (PA ID #63293)
                                             MORGAN, LEWIS & BOCKIUS LLP
                                             One Oxford Centre, 32nd Floor
                                             Pittsburgh, PA  15219
                                             Tel:  (412) 560-3300
                                             Fax:  (412) 560-7001
                                             christopher.ramsey@morganlewis.com

                                             *Counsel for Defendant BNY Mellon*