## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA ELLIS,                                    )
                                               )
      Plaintiff,                        )
                                               )        Civil A. No. 18-1549
v.                                             )        Senior Judge Nora Barry Fischer
                                               )
BANK OF NEW YORK MELLON CORP.,                 )
                                               )
      Defendant.                        )
                                               )

## MEMORANDUM OPINION

### I.     INTRODUCTION

In this employment discrimination action under Title VII, 42 U.S.C. § 20000 *et seq.*, and Section 1981, 42 U.S.C. § 1981, Plaintiff Lisa Ellis ("Ellis") alleges that she was terminated from her employment with Defendant The Bank of New York Mellon Corporation ("BNY Mellon" or "Company")[1] because of her race.  (Docket No. 1).  BNY Mellon now moves for summary judgment, which Ellis naturally opposes.  (Docket Nos. 35, 42).  The Court having considered the parties' respective positions and evaluated the evidence in light of the standard governing motions for summary judgment, grants BNY Mellon's motion for the reasons that follow.  (Docket No. 35).

### II.    RELEVANT FACTUAL BACKGROUND[2]

Ellis, who is white, was employed as a Control Group Project Manager in BNY Mellon's

---

[1] BNY Mellon provides a wide array of financial services to corporations and institutions around the world.  (Docket No. 45 ¶ 1).  It operates in several primary financial services sectors including advisory services, asset management, asset servicing, broker-dealer, issuance services, treasury services, and wealth management.  (*Id.*)

[2] *See* (Docket Nos. 45, 47).  The Court construes the facts in the light most favorable to the nonmoving party.  *See Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015).  As reflected in Docket Nos. 45 and 47, nearly all of the facts are undisputed, and where the parties disagree, they disagree as to the legal conclusion that can be derived from those facts.

Wealth Management Department.[3]  (Docket No. 45 ¶¶ 2, 5).  She was hired on July 27, 2015 on an at-will basis and was assigned to work in the Company's Pittsburgh office.[4]  Throughout her employment, she was well regarded by her co-workers and was characterized as an "exceptional employee" by her supervisor, Coleen Holzinger ("Holzinger").  (*Id.* ¶ 4; Docket No. 47 ¶¶ 69-70).  On July 3, 2018, however, Ellis was terminated from her employment for violating the Company's "Code of Conduct" ("Code") and its "Use of External Social Media Policy" ("Social Media Policy").  (Docket No. 45 ¶¶ 39-40, 49-50).  Despite acknowledging that her adherence to these policies was a condition of her employment, Ellis now challenges whether her termination was lawful.  (*Id.* ¶¶ 49-50).

A.    *Ellis's Facebook Post and the Readers' Response*

On Saturday, June 30, 2018, using her personal Facebook account, Ellis commented on a local news story, "Total BS.  He should have taken a bus to plow thru [sic]."  (*Id.* ¶ 11; Docket No 38-2 at 24).  The story was about a councilman who had been arrested for driving a car through a crowd of demonstrators protesting the untimely death of Antwon Rose, Jr., a young African American male who was shot and killed by an East Pittsburgh Police Officer eleven days prior.[5]  (Docket Nos. 45 ¶¶ 8, 11; 47 ¶ 72).  Because her Facebook account was set to "public," those who were offended by her post were able to quickly learn that she worked as a "Vice President"[6] for BNY Mellon, and they inundated her employer with complaints.  (Docket No. 45 ¶¶ 12-14).  They not only messaged BNY Mellon on Facebook, tagged the Company in their Facebook posts, and

---

[3] Her role was primarily in risk management and oversight administration of products or accounts that reside in the IRA and employee benefit areas.  (Docket No. 45 ¶ 3).

[4] In Ellis's offer letter it states, "While we have every expectation that you will have a successful career with us, your employment with BNY Mellon, its subsidiaries, affiliates, successors, related companies and assigns is 'at will,' and the employment relationship may be terminated at any time by you or the company with or without cause."  (Docket No. 44-7 at 3).

[5] The shooting led to numerous demonstrations throughout the Greater Pittsburgh region.  (Docket No. 47 ¶ 71).

[6] Although Ellis listed on her Facebook page that she was a Vice President, her official title was Control Group Project Manager.  (Docket No. 45 ¶¶ 2, 5, 12-14).

called the ethics hotline but some even went as far as to contact its Chief Executive Officer and the Chief Human Resources Officer directly.  (*Id.* ¶ 15).  The complaints were largely uniform — they demanded to know whether Ellis's post reflected the values of the Company and condemned the post for encouraging violence.  (Docket No. 47 ¶ 75).  The following is a sampling of the complaints that BNY Mellon received:

- "A man runs over protestors in Pittsburgh and gets charged for his crime.  This is the VP of BNY Mellon's response 'total b.s., too bad he didn't have a bus to plow through.'  Does BNY Mellon allow their employees to promote attempted vehicular homicide?  Does this represent your core values?  If [n]o, what is the policy on social media presence of professionals that represent your company?  Answers please!!"  Complaint received by BNY Mellon through Facebook from Taffi Williams on July 2, 2018.

- "Our community is in a lot of pain and are exercising our right to protest.  Recently during one of the protests a man felt he could run through the crowd and hurt someone.  In light of all the pain, one of your employees, Lisa A. Ellis, made disturbing and inhuman posts regarding the man's actions.  I have added the 'screen shots'[sic].  BNY Mellon, is this how you allow your employees to act and represent your community?"  Complaint received by BNY Mellon through the BNY Mellon ethics hotline from Alyssa Roig on July 2, 2018.

- "Good morning, have you seen the vile and vicious comments from one of your VPs, Lisa A[.] Ellis.  Ms. Ellis believes in animal rights, [h]owever, the rights of peaceful demonstrators does[sic] not exist.  'Too bad he didn't have a bus to plow thru', I guess that says it all?"  Complaint received by BNY Mellon through the "Contact Us" form on BNYMellon.com from Carey Robinson on July 2, 2018.

- "I need to know if this is the morals and values of your bank.  For someone so high up the chain to feel this way, I'm disgusted and need answers.  I was going to apply for a job, but after seeing the view of this employee[,] I'm second guessing things."  Complaint received by BNY Mellon through Facebook on July 2, 2018.[7]

- It was brought to my attention that an employee of yours was on Facebook making some disturbing comments.   Apparently[,] Lisa is disappointed that the local councilman arrested for running over a group of law[-]abiding peaceful protestors didn't have a bus to run them over.  I hope you don't share the same views as Lisa."  Complaint received by BNY Mellon through Facebook from Ashely Palmer on July 2, 2018.

---

[7] It is unclear from the record who made this complaint.  (Docket Nos. 38-9 at 15; 45 ¶ 16).

(Docket Nos. 38-9 at 15; 45 ¶ 16).

B.      *BNY Mellon's Investigation*

By Monday morning, July 2, 2018, BNY Mellon's Corporate Communications group had already received multiple direct messages about Ellis's post through BNY Mellon's Careers Facebook page.[8]  (Docket No. 45 ¶ 18).  This group then informed Jack Cameron ("Cameron"), the then Global Head of Human Resource Governance and Employee Relations, about the post.  (*Id.*)  Cameron directed Thomas Galante ("Galante"), also of Employee Relations, to investigate.[9]  (*Id.* ¶¶ 18-19).  He coordinated the investigation with Cindy Wurzbacher ("Wurzbacher"), the Vice President of Human Resources and the Senior Human Resources Business Partner for Ellis's division.  (*Id.* ¶ 20; Docket No. 47 ¶ 76).

Later that day, Galante and Wurzbacher interviewed Ellis.  (Docket No. 45 ¶ 21).  She confirmed that she had written the post and that her Facebook page identified BNY Mellon as her employer.[10]  (*Id.* ¶¶ 21-23).  Ellis also revealed that she had received a troubling telephone call that morning.  (*Id.* ¶ 24).  An anonymous person had told her that she was a "jerk" and warned her that "[K]arma's a bitch."  (Docket No. 44-3 at 2).  Galante responded that her post was serious and emphasized that the investigation was ongoing and that disciplinary action, including termination, was being considered.  (Docket No. 45 ¶ 25).  He explained that the post injured the reputation not only of BNY Mellon but also of her Wealth Management Group.  (Docket No. 44-3 at 2).  After completing the interview, they sent Ellis home.  (Docket No. 45 ¶ 26).

Galante and Wurzbacher next convened a telephonic conference with Cameron; Rick Adams ("Adams"), the Chief Control Officer for the Wealth Management Division; Enrich Smith

---

[8] BNY Mellon only learned of Ellis's post as a result of the public outcry; it does not monitor its employees' private social media accounts.  (Docket No. 45 ¶ 17).

[9] Galante learned of Ellis's post prior to being directed by Cameron to investigate.  (Docket No. 38-8 at 5-6).

[10] Nothing was made of the fact that her Facebook page misstated her title at the Company.  (Docket No. 45 ¶¶ 2, 23).

("Smith"),[11] the Chief Operating Officer of Wealth Management; Christina Drago ("Drago") of Human Resources; and other unnamed representatives from BNY Mellon's Legal, Employee Relations, and Human Resources Departments to review their findings. (*Id.* ¶¶ 4, 6, 27; Docket Nos. 38-2 at 3; 47 ¶ 76). With Galante taking the lead, they discussed the content of Ellis's post; the complaints the Company received including the fact that the Chief Executive Officer, the Chief Human Resources Officer, and Ellis were all contacted directly pertaining to same; their interview with Ellis; and the Company's policies and procedures relating to Ellis's conduct, i.e., BNY Mellon's Code and Social Media Policy. (Docket Nos. 44-2 at 6; 44-3 at 3; 45 ¶¶ 28-30). Concerning the Code, they addressed the Company's expectation that employees use good judgment and respect others. (Docket No. 45 ¶ 29). Similarly, as to the Social Media Policy, they stressed that it prohibited employees from engaging in conduct that could harm the reputation of BNY Mellon in any way. (*Id.* ¶ 30). Everyone agreed that Ellis's post created a reputational risk and was offensive because it advocated violence. (*Id.* ¶¶ 30-31). Indeed, BNY Mellon had received a number of inquiries asking whether Ellis's post was representative of the Company and its values. (*Id.* ¶ 32). Throughout the meeting, Ellis's race was never mentioned nor was the fact that her post could be construed as reflecting racial bias or prejudice.[12] (Docket No. 44-2 at 2).

Based on the language of the post and their belief that Ellis's conduct was a significant violation of both the Code and the Social Media Policy, Galante, Wurzbacher, and Cameron all recommended terminating Ellis.[13] (Docket No. 45 ¶ 34). The decision was unanimous; no one suggested that BNY Mellon issue discipline short of termination. (*Id.* ¶ 36). They felt bad because

---

[11] Adams reported directly to Smith. (*Id.* ¶ 6).

[12] Galante had no idea Ellis was white until he looked her up in the Company database on July 3rd. (Docket No. 38-8 at 14).

[13] Wurzbacher, in her deposition, explained that Ellis's post violated the Social Media Policy by failing to treat people with respect, using poor judgment, and "creating a reputational risk for the company." (Docket No. 44-2 at 4). Adams testified similarly explaining that he believed that it violated the Social Media Policy in that it created a reputational risk, demonstrated a lack of respect for others, and used poor judgment. (Docket No. 44-13 at 2).

Ellis was a good employee, but they did not believe her post gave them any other option.  (Docket No. 44-2 at 7).  The ultimate decision to terminate was made by Adams and Smith.[14]  (Docket No. at 38-2 at 14-16).

On July 3, 2019, Adams and Wurzbacher notified Ellis, an at-will employee, that she was terminated, effective immediately.  (Docket No. 45 ¶¶ 2, 39).  They explained that she violated the Code and the Social Media Policy because her post was offensive, demonstrated poor judgment, showed a lack of respect for others, harmed BNY Mellon's reputation, and encouraged violent behavior.  (*Id.* ¶ 37).  This was the first time BNY Mellon terminated someone for violating the Social Media Policy.  (Docket No. 44-2 at 7).

C.      *BNY Mellon's Code of Conduct and Social Media Policy*

The Code and the Social Media Policy were in effect throughout Ellis's employment at BNY Mellon.  (Docket No. 45 ¶¶ 45-46).  Ellis understood that she was expected to comply with both and that her compliance with them was a condition of her employment.  (*Id.*)  In the introductory letter to the Code, BNY Mellon's Chief Executive Officer wrote,

> [T]he Code itself cannot address every possible situation.  We expect all employees to exercise good judgment, using the Code as a primary resource to better understand our principles of ethical behavior, and to seek help when unsure of the right course of action.  Above all, each of us, regardless of level, are obligated to put the interests of our company, clients and shareholders above any personal interest. . . .  Being a BNY employee means exercising good judgment and conducting yourself in a manner that is above reproach. . . .

(Docket No. 44-17 at 3) (emphasis added).  The Code begins by setting forth what BNY Mellon means when it tells its employees to "d[o] what's right."  (*Id.* at 4).  Employees are expected to

---

[14] It bears mentioning that Ellis disputes this fact arguing that Cameron was also a decisionmaker and cites to Wurzbacher's deposition and her notes in support of this claim.  (Docket No. 45 ¶ 35).  However, Wurzbacher unequivocally testified that the ultimate decision fell to Adams.  (Docket No. 44-2 at 9).  As to Wurzbacher's notes, they only indicate that Galante, Cameron, and one other person whose name has been redacted recommended termination.  (Docket No. 44-3 at 3).

"respect [their] clients, communities[,] and one another" and to be "accountable for [their] own and [their] team['s] actions." (*Id.*) (emphasis added). Further, when an employee is uncertain whether something is "right", the employee must ask, "could the action affect the company's reputation?" or "would it look bad if reported in the media?" (*Id.*) "If the answer to [either] of these questions is 'yes,'" the employee must speak with a manager, the Compliance and Ethics Department, Legal or Human Resources, or the Ethics Office before doing anything. (*Id.*) In fact, employees are encouraged to be persistent and not to stop searching for an answer until they get the help they need. (*Id.*)

The Code also sets forth BNY Mellon's "Key Principles," two of which are relevant here, "Respecting Others" and "Supporting our Communities." (*Id.* at 6). For "Respecting Others," the Code provides,

> [w]e are committed to fostering an inclusive workplace where talented people want to stay and develop their careers. Supporting a diverse, engaged workforce allows us to be successful in building trust, empowering teams, serving our clients and outperforming our peers. We give equal employment opportunity to all individuals in compliance with legal requirements and because it's the right thing to do.[15]

(*Id.*) Part and parcel to this is the requirement that employees "contribute to maintaining a workplace free from aggression. Threats, intimidating behavior[,] or any acts of violence will not be tolerated." (*Id.* at 17). As for "Supporting our Communities," the Code states:

We take an active part in our communities around the world, both as individuals

---

[15] To this end, the Company is committed to a harassment-free environment:

> BNY Mellon will not tolerate any form of harassment or discrimination. Harassment can be verbal, physical or include visual images where the effect creates an offensive atmosphere. It can take many forms and includes jokes, slurs[,] and offensive remarks, whether delivered verbally, graphically or in electronic media, including e-mail. Harassment also includes disrespectful behavior or remarks that involve a person's race, color, sex, age, sexual orientation, gender identity, religion, disability, national origin[,] or any other legally protected status. Certain local laws or regulations may provide additional protection for employees, so check with Human Resources or the Legal department in your local area if you have questions.

(Docket No. 44-14 at 16).

7

> and as a company.  Our long-term success is linked to the strength of the global economy and the strength of our industry.  <u>We are honest, fair[,] and transparent in every way that we interact with our communities and the public at large.</u>

(*Id.* at 6) (emphasis added).  Finally, the Code cautions, "[r]emember, ignorance or a lack of understanding is not an excuse for violating the Code.  The company has established many resources to help deal with questions you may have regarding compliance with the Code.  You're expected to take advantage of those resources."  (*Id.* at 54).

Turning to BNY Mellon's Social Media Policy, it was implemented because, "[m]any of [BNY Mellon's] employees participate in external social media in their personal lives."  (Docket No. 38-13 at 2).  As a result, the Social Media Policy "sets rules and offers guidelines regarding (i) . . . <u>personal use</u> of external social media" for the Company's employees, contractors, and consultants.  (*Id.*)  Indeed, everyone who represents BNY Mellon is expected to comply with this policy when posting on "wikis, blogs, personal websites, file sharing sites, discussion forums, review sites, and social networks, such as . . . Facebook."  (*Id.*)

The Social Media Policy warns, "[b]e professional and responsible when posting on external social media; <u>you are responsible for what you post</u>"; "[e]nsure that you comply with your obligations as an employee of BNY Mellon as specified in applicable employment agreements, policies or implied by law," and "[b]e respectful and remain aware of the BNY Mellon policies prohibiting unlawful harassment and discrimination and be sure that your postings are in compliance with these policies."  (*Id.* at 2-3) (emphasis added).  Finally, it instructs that "in addition to the requirements set out in this [Social Media] Policy, employees' use of external social media <u>must also comply with BNY Mellon's Code of Conduct</u>" and that

> [t]he above restrictions are consistent with the key principles of BNY Mellon's Code of Conduct.  <u>Your use of external social media that harms or impairs BNY Mellon's financial or professional reputation or is damaging to BNY Mellon in any other respect may result in consequences affecting your employment status.</u>  You

may be subject to disciplinary action, <u>up to and including termination</u> of employment, if you violate this Policy.

(*Id.* at 2, 6) (emphasis added).

D.    *Ellis's Deposition Testimony*

During her deposition, Ellis confirmed that her post was a "stupid mistake," was made using "poor judgment," was not respectful, and was subject to various interpretations. (Docket No. 45 ¶ 41). She admitted that it could be interpreted to encourage violent behavior and that had the councilman used a bus the damage would have been even more catastrophic. (*Id.* ¶ 42). Ellis was, however, resolute that it was "BS" that the councilman had been arrested. (*Id.* ¶ 43). She explained that she had written the post because she wanted people to know that she supported him. (*Id.* ¶ 44).

She was also asked about her experiences at BNY Mellon and why she believed that she was terminated. (Docket No. 38-4). Relating to race, Ellis testified:

Q: Did anyone at BNY Mellon ever bring up your race in any regard in any conversation with you for the entire duration of your employment with the company?
A: No.
Q: Your understanding of why your race was a potential factor in the decision to terminate you, is because this other group, Partners In Justice,[16] they may have thought you were racist, and they sent your comment to BNY Mellon?
A: Yes.
Q: But you have no evidence that anyone at BNY Mellon thought your comment was racist, do you?
A. Well, I don't have – –I don't know. That's why in the letter I sent to Catherine[17], [I] confirmed my post was not racist. I don't know what their thoughts were when they fired me.
Q: Well, you know they thought that you violated company policies, right?
A: Right. But I didn't know specifically what they were speaking of.
Q: You know they were talking about the Code of Conduct at least?

---

[16] The parties do not identify what "Partners In Justice" is or what it does. It is clear, however, that the organization deemed Ellis's Facebook post to be racist and its member(s) informed BNY Mellon of the post. (Docket No. 38-4 at 27-28).

[17] Adams reported to a woman named "Catherine," but it is unclear from the record whether she is the same person to whom Ellis wrote the letter explaining her actions. (Docket No. 38-2 at 4-5). The letter is not part of the record.

A: Yes.

(*Id.* at 27-28).  When asked about her prior experience with discrimination at BNY Mellon, Ellis

stated:

> Q: You don't believe Rick [Adams] or Coleen [Holzinger] would discriminate against you, right?
> A: I don't believe.
> Q: And you don't think they ever had done anything discriminatory to you before?
> A: No.

(*Id.* at 4).

> Q: [Y]ou just said you did not feel you were discriminated [against] at any point other than your termination, correct?
> A: At the time I was terminated, that's correct.
> Q: Do you now feel like you were discriminated against at a different time other than your termination?
> A: Well – no. . . .
> Q: [Y]our direct manager was Coleen Holzinger. What race is Coleen?
> A: White.
> Q: And you said before you never felt like she discriminated against you?
> A: No.
> …
> Q: Did you ever witness [Holzinger] engage in behavior towards anyone you thought was discriminatory based on their race?
> A: No.
> Q: Her supervisor was Rick Adams who you worked with also?
> A: Yes.
> Q: What race is [Adams]?
> A: White, Italian.
> Q: Did you ever hear [Adams] make any race-related comments?
> A: No.
> Q: Did you ever hear [Adams] make any race-related comments to anybody else?
> A: No.
> Q: Did you ever witness [Adams] engage in behavior you believe discriminated against anyone on the basis of their race?
> A: No.
> . . .
> Q: So to summarize, you never heard any of your supervisors make any race-related comments to anybody?
> A: Correct.

(*Id.* at 22-23, 24, 26) (emphasis added).

D.      *Possible Comparators*

The parties identified four possible comparators: Nicole Manns ("Manns"), Brandon Nichols ("Nichols"), Aaron Schall ("Schall"), and Carra Thomas Reed ("Reed").  Ellis did not work in the same division as any of the alleged comparators and does not personally know them. (Docket No. 38-4 at 30-31).  Manns is African American and is both a Vice President of BNY Mellon and a Manager of Affirmative Action Compliance.  (Docket No. 47 ¶ 80).  She reported directly to Cameron.  (*Id.* ¶ 81).  On June 26, 2018, she posted the following comment on her public Facebook page:

> Against my better judgment, I just read some comments related to Antwon Rose, Jr. running.  Here's an idea, if you've never experienced what it feels like to be in a situation that could result in your death, NO MATTER WHAT YOU DO...please, kindly, Shut TF Up.
>
> *note* This message is NOT race specific.  It's for people who say and I quote, "Why wouldn't he just follow the officer's command?  They are the law!"

(*Id.* ¶ 82; Docket No. 44-16).  Five months after Ellis was terminated, Manns posted:

> I was always afraid to have a son because it always seemed that everyone was trying to kill black men (and so many are trying to kill them).  It seemed that girls were easier, safer.  Sure, they could get into some trouble but it didn't feel like people were actively trying to kill them.  Well, Sandra Bland and others brought so much to light about police brutality and this story reminds us that one sick, angry piece of trash can take your daughter away from you.  A man who raises his hand to a woman in anger should pick a bridge and step right tf off.

(Docket No. 45 ¶ 54).  On November 21, 2018, BNY Mellon received a complaint about Manns's posts from Gregg Phillips, a personal friend of Ellis.  (*Id.* ¶ 55).  Following an investigation, Elizabeth Windsor, an in-house attorney for the Company, met with Manns to discuss her post. (Docket No. 47 ¶ 84).  She counseled Manns to be mindful of what she posts and encouraged her to adjust her privacy settings.  (*Id.*)  Although the Company did not take further action (Docket

No. 45 ¶ 57), BNY Mellon's Fed. R. Civ. P. 30(b)(6) witness testified that the post was inconsistent with its values.  (Docket No. 47 ¶ 87).

Nichols was an African American contractor who provided services to BNY Mellon. (Docket No. 45 ¶ 60).  On March 25, 2019, BNY Mellon received a complaint from an external source concerning one of his Facebook posts.  (*Id.* ¶ 59).  Nichols had written, "Good I hope they hit him and that pig," the night that the East Pittsburgh Police Officer was acquitted in the death of Antwon Rose, Jr. and shots were fired into the office of defense counsel.  (*Id.* ¶¶ 60-61).  Upon learning of the post, BNY Mellon immediately terminated Nichols's assignment finding that his post was violent, encouraged violence, violated multiple BNY Mellon policies, and appeared to express a desire for both the police officer and his attorney to be killed.  (*Id.* ¶ 63).

Reed, who is African American, was an employee in BNY Mellon's Human Resources Department.[18]  (Docket No. 47 ¶ 88).  On June 25, 2018, Reed posted the following message on her public Facebook page (which is not referring to Ellis):[19]

> I can't believe this white girl at my job, BNY Mellon, who I thought I was cool with, just said she don't[sic] blame them for running over the peaceful protestors. Someone please pray for [me] because I'm on 🔫 right now and I'm really not tryna[sic] loose[sic] my job yet smh.

(*Id.*) (emphasis added).  Her friend, Danietra Brown, responded, "Agreed she isnt[sic] worth your paycheck or a charge," and Reed replied, "u[sic] right."[20]  (Docket No. 44-17).  Galante had a meeting with Reed to discuss her Facebook post but did not take any adverse employment action against her.  (*Id.* ¶ 91).  BNY Mellon's Fed. R. Civ. P. 30(b)(6) representative testified that Reed's

---

[18] The reasons for her separation from BNY Mellon are unclear but are unrelated to her post.  (Docket No. 44-5 at 9-10).

[19] The "white girl" referred to in the post was one of Reed's coworkers in the call center named Nicole Marino. (Docket No. 44-18).

[20] It is unclear from the record whether Danietra Brown worked for BNY Mellon or whether she was simply a Facebook friend.

post was "contrary to the values of BNY Mellon" and not "positive communication."  (Docket No. 47 ¶ 90).

On July 3, 2019, BNY Mellon opened an investigation focused on Schall, a white BNY Mellon employee, after receiving an external complaint to its ethics hotline about a comment he made on Facebook.  (Docket No. 45 ¶ 64).  He had posted:

> Yeah I know.  It's like enough with the protesting already!  They made their point loud and clear.  We get the message.  Protesting aggressively and damaging cars being destructive isn't going to bring back that 17 year old kid's life.  Causing riots is not making those protestors any better than that cop out of line[sic].

(*Id.* ¶ 65).  After learning of this complaint, BNY Mellon conducted an investigation and determined that the post warranted a discussion with Schall.  (*Id.* ¶ 66).  As this post did not encourage or in any way advocate for violence against anyone or otherwise violate BNY Mellon's policies, Galante closed the investigation on July 6, 2019, reminded Schall about the Social Media Policy, reviewed it with him, and cautioned him that he should be careful about public posts and to not make any representation that his opinions reflect those of BNY Mellon.  (*Id.* ¶ 67).  Schall was not disciplined for his post.  (*Id.* ¶ 68).

## III.   RELEVANT PROCEDURAL HISTORY

On November 16, 2018, Ellis filed a Complaint against BNY Mellon for race discrimination under Title VII and Section 1981.[21]  (Docket No. 1).  BNY Mellon filed an Answer on January 9, 2019.  (Docket No. 9).  The matter then proceeded through ADR and discovery.  (Docket Nos. 27, 31).  The parties sought and were granted an extension of time to complete discovery, which ultimately closed on August 31, 2019.  (Docket No. 31).  Thereafter, the parties requested a summary judgment briefing order, which this Court issued.  (Docket No. 32).

---

[21] Ellis filed a charge of discrimination with the Equal Employment Opportunity Commission on September 24, 2018. (Docket No. 1 ¶ 2).  Within ninety days of receiving the Notice of Right to Sue letter, she filed the instant action.  (*Id.*)

On October 16, 2019, BNY Mellon moved for summary judgment and filed with it a brief in support thereof, a concise statement of material facts, and supporting exhibits.  (Docket Nos. 35-38, 41).  A month later, Ellis filed her brief in opposition, her response to concise statement of material facts, and a supporting appendix.  (Dockets Nos. 43-45).  Two weeks later, BNY Mellon filed both a reply brief and a reply to Ellis's concise statement of material facts.  (Docket Nos. 46-47).  Ellis filed a surreply brief seven days later.  (Docket Nos. 48).

Upon consideration of Ellis's surreply, the Court ordered BNY Mellon to file a supplemental brief addressing *Hampshire v. Bard*, No. 19-1565, 2019 WL 6273432 (3d Cir. Nov. 25, 2019), which the Company did on December 30, 2019.  (Docket Nos. 49-50).  Oral argument was held on January 14, 2020, after which the transcript was prepared.[22]  (Docket Nos. 51, 57). Next, the Court ordered BNY Mellon to produce the full deposition transcript of Galante and a copy of its "Social Media Best Practices" and "Use of External Social Media: Governance Model" referenced in its Social Media Policy.  (Docket No. 52).  A Rule to Show Cause was also issued on BNY Mellon to confirm that the dates identified in Galante's Declaration were accurate.  (*Id.*) BNY Mellon responded to the Rule a week later.  (Docket Nos. 55-56).  The matter is now ripe for disposition.

## IV.   LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine dispute of material fact is one that could affect the outcome of litigation.  *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  However, "[w]here the record taken

---

[22] A transcript of the argument was filed on February 14, 2020.  (Docket No. 57).

as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini*, 795 F.3d at 416 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court, as it has noted, is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The benefit of the doubt is to be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

A well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). Similarly, "[s]ummary judgment cannot be avoided by resorting to speculation, or statements of personal opinion or mere belief; indeed, 'inference based on speculation or conjecture does not create a material factual dispute.'" *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 527 (D.N.J. 2013) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir. 1990)); *see also Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) ("[T]he non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment"). Instead, the non-moving party must resort to affidavits,

15

deposition testimony, admissions, and/or interrogatory answers to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing FED. R. CIV. P. 56(c)(1)(A)).  Here the facts are such that Ellis cannot muster a material question of fact.

V.     DISCUSSION

Having considered the facts of record and the parties' legal arguments, BNY Mellon is entitled to judgment as a matter of law because Ellis has failed to make out a prima facie case of discrimination and she cannot rebut BNY Mellon's legitimate, nondiscriminatory reasons for her termination.  The Court's analysis follows.

Title VII's anti-discrimination provision, codified at 42 U.S.C. § 2000e-2(a), makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a).  Similarly, Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981.  The United States Court of Appeals for the Third Circuit has held that, in the employment context, the "substantive elements" of a discrimination claim under § 1981 are "generally identical" to those of a discrimination claim under Title VII. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009); *but see Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, --- U.S.---, 140 S.Ct. 1009, 1014 (Mar. 23, 2020) (holding that only but-for causation applies to § 1981 claims).  Because the scope of protection provided by § 1981 is not materially different

16

from that provided under Title VII except when it comes to the plaintiff's burden on pretext, the Court's analysis of Ellis's Title VII claims will be similarly applicable to her § 1981 claims.

Where the plaintiff relies on indirect proof of discrimination, such claims are analyzed pursuant to the familiar three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017); *Gethers v. PNC Bank*, ---F. App'x ---, 2020 WL 2392231, at *2 (3d Cir. May 12, 2020); *Mazur v. Sw. Veterans Ctr.*, 2019 WL 4345726, at *29 (W.D. Pa. Sept. 12, 2019), *aff'd*, ---F. App'x ---, 2020 WL 1062640 (3d Cir. Mar. 5, 2020). Pursuant to this framework, a plaintiff must first make out a prima facie case of discrimination. *Mazur*, 2020 WL 1062640, at *3. If the plaintiff is successful, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the defendant proceeds accordingly, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence, that the defendant's articulated reason for the challenged action is a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804-05; *Bielich v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 612 (W.D. Pa. 2014). It bears mentioning that "only the burden of production ever shifts to the defendant, never the burden of persuasion." *Comcast Corp.*, 140 S.Ct. at 1019.

Establishing a prima facie case is not a heavy burden. *McDonnell Douglas*, 411 U.S. at 802; *Xu Feng v. Univ. of Del*, 785 F. App'x 53, 55 (3d Cir. Aug. 28, 2019). A plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of unlawful discrimination. *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, at *3 (3d Cir. 2020); *Gethers*, 2020 WL 2392231, at *2. "A plaintiff alleging a

claim of reverse race discrimination under Title VII is not required to prove the first element of the prima facie case, i.e., he or she is a member of a protected class or racial minority." *Koller v. Riply Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 517 (E.D. Pa. 2012) (citing *Iadimarco v. Runyon*, 190 F.3d 151, 157-58 (3d Cir. 1999)); *Bryson v. City of Wilmington*, No. CV 17-133, 2019 WL 181319, at *7 (D. Del. Jan. 11, 2019). Here, BNY Mellon does not challenge that Ellis was qualified for her position or that she suffered an adverse employment action. (Docket No. 36 at 16). Rather, it contends that Ellis cannot establish the fourth element and, thus, summary judgment should be granted in its favor. (*Id.*) Ellis counters that BNY Mellon treated two similarly situated African American employees, Reed and Manns, more favorably than her. (Docket No. 42 at 8-15).

To establish the fourth element, a plaintiff may either: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action." *Drummer v. Hosp. of Univ. of Pennsylvania*, --F.Supp.3d --, 2020 WL 1922743, at *4 (E.D. Pa. Apr. 21, 2020) (quoting *Green v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)); *see Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268-69 (3d Cir. 2010) (stating "comparative evidence is often highly probative of discrimination, [but] it is not an essential element of a plaintiff's case"). Here, in arguing that summary judgment is not proper, Ellis relies solely on comparative evidence. However, Ellis's purported comparators are not similarly situated. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (per curiam) (stating "[t]he central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their

race . . . .") (internal quotation marks omitted).

To meet her burden using comparative evidence, Ellis must identify a similarly situated individual who was not a member of her protected class and was treated more favorably. *White v. Purolite Corp.*, Civ. Act. No. 19-1736, 2020 WL 1875632, at *3 (E.D. Pa. Apr. 15, 2020) (internal citation and quotation omitted); *see Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) (explaining "[t]he plaintiff has the burden of demonstrating that similarly situated persons were treated differently"); *Mazur*, 2020 WL 1062640, at *3.  "'[S]imilarly situated' does not mean 'identically situated,' [rather] a plaintiff must demonstrate that she is similar to the alleged comparator in relevant respects." *Jackson v. PNC Bank*, 2016 WL 7324595, *6 (W.D. Pa. Dec. 16, 2016) (emphasis added).  It is "a fact-intensive inquiry based on a whole constellation of factors." *Mazur*, 2019 WL 4345726, at *30 (quoting *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 306 (3d Cir. 2004)).  Factors relevant to making this determination include: whether the two employees dealt with the same supervisor, had the same job description, were subject to the same standards, engaged in the same conduct, and the particular criteria or qualifications identified by the employer as the reason for the adverse action. *Simpson*, 142 F.3d at 646-47; *see In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2008); *Mazur*, 2019 WL 4345726, at *30.  Thus, context matters in assessing the factors relevant to the inquiry of whether two employees are similarly situated. *Epps v. First Energy Nuclear Operating Co*., Civ. Act. No. 11-1462, 2013 WL 1216858, at *18 (W.D. Pa. Mar. 25, 2013).  When making this determination, the plaintiff "cannot 'pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she.'" *Alinoski v. Musculoskeletal Transplant Found., Inc.*, 679 F. App'x 224, 226 (3d Cir. 2017) (quoting *Simpson*, 142 F.3d at 646-47).

As previously stated, Ellis identifies two potential comparators, Manns and Reed.  (Docket No. 42).  But, there are problems in considering them as comparators in that they worked in different positions, in different departments, had different responsibilities, and reported to different supervisors than Ellis did.  *See Glass v. First Judicial Dist. of Pa.*, 734 F. App'x 136, 140 (3d Cir. 2018) (finding OCC Officers not comparable where the plaintiff was assigned to work in the courtroom and the other purported comparators performed largely desk work).  In fact, both Reed and Manns worked in compliance; Reed was an employee in BNY Mellon's Human Resources Department and Manns is both a Vice President of BNY Mellon and is the Manager of Affirmative Action Compliance.  (Docket No. 47 ¶¶ 80, 88).  Ellis, conversely, worked on the business side of the Company as a Project Manager in BNY Mellon's Wealth Management Department.  (Docket No. 45 ¶ 2).

Ellis's argument that Manns and Reed are similarly situated because Galante and Cameron "had the authority" to discipline them is a "red herring."  (Docket Nos. 42 at 14; 47 ¶¶ 76, 81, 91). Neither Galante nor Cameron made the final decision to end Ellis's employment; rather, they were just two of a handful of people who unanimously recommended terminating her.  *See Peake v. Pa. State Police*, 644 F. App'x 148, 152 (3d Cir. 2016) (providing "We find it significant that 13 out of the 19 individuals interviewed pertaining to Peake's performance recommended that he not be retained.  Indeed, not a single individual recommended retention").  Rather, the decision to terminate Ellis was made by Adams and Smith alone.  (Docket No. 38-2 at 14-16).  Further, there is no evidence in the record that either Adams or Smith were consulted about Manns's or Reed's posts or whether they even knew about same.  (Docket No. 36).

Focusing on the post at issue, Ellis's post does not compare with Manns's or Reed's in either content or manner.  *See Koslosky v. Am. Airlines, Inc.*, Civ. Act. No. 2:18-CV-04654-JDW,

2020 WL 1984886, at *5 (E.D. Pa. Apr. 27, 2020) (explaining that the content of a Facebook post matters when it comes to determining whether a person is a proper comparator).  Ellis voiced her solidarity with a councilman who had driven through a crowd of protestors in the city where she was working by suggesting he should have used a bus instead. (Docket Nos. 38-6; 45 ¶ 11).  She made this comment on a <u>public news</u> story.  (Docket Nos. 38-6; 45 ¶ 11).  Consequently, anyone who read the article could see her post along with the 1,000+ comments that followed.  (Docket Nos. 38-5; 38-6).  Yet, Manns's and Reed's posts were not posted on news reports and did not voice solidarity with violent actors.  (Docket Nos. 44-16, 45 ¶ 54, 47 ¶ 88).  In addition, Manns's post, which Ellis contends advocates violence, was made on a shared photo and written in response to a story about a woman who was killed in Chicago after a domestic violence incident five months after Ellis's position at the Company had ended.  (Docket No. 44-4).  Thus, the posts and the forum in which they were made are not comparable.  As no reasonable jury could find that the comparators Ellis identified were similarly situated, summary judgment must be granted in favor of BNY Mellon.[23]  *See Hampshire*, 793 F. App'x at 80.  (finding "a court may nonetheless grant summary judgment if no reasonable jury could find that the individuals identified by the plaintiffs were similarly situated").

    Although the Court has found no evidence of racial discrimination on the record before it, the Court will address BNY Mellon's argument that it has articulated a legitimate, nondiscriminatory reason for Ellis's termination, i.e., that she violated the Code and the Social Media Policy by writing a post on Facebook that was offensive in nature, advocated violence, demonstrated extremely poor judgment, and created a reputational risk not just to the Company

---

[23] BNY Mellon correctly suggests that potential comparators cannot be considered in a vacuum.  *See Alinoski.*, 679 F. App'x at 226 (quoting *Simpson*, 142 F.3d at 646-47).  BNY Mellon's treatment of those both within and outside of Ellis's protected class (Schall and Nichols, respectively) gives further support to the Company's position that Ellis's race had nothing to do with her firing.  *See* (Docket No. 45 ¶¶ 60-68).

but to the Wealth Management Group.  (Docket No. 36 at 21).  This Court accepts this argument. *Fuentes*, 32 F.3d at 763 (explaining the burden placed on an employer to articulate a legitimate, nondiscriminatory reason is "relatively light").

　　　To rebut BNY Mellon's legitimate nondiscriminatory reason under Title VII, Ellis needs to "establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action." *Sarullo*, 352 F.3d at 797.  As to her § 1981 claim, she must show that her race was the but-for cause of her injury. *See Comcast Corp.*, 140 S.Ct. at 1014.  But nothing in the record establishes that BNY Mellon's reasons for dismissing Ellis were pretextual.  Indeed, the record lacks any evidence that even implies that BNY Mellon exhibited racial animus.  Ellis was terminated for <u>multiple violations</u> of the Code and Social Media Policy, i.e., because her post was offensive, demonstrated poor judgment, showed a lack of respect for others, harmed BNY Mellon's reputation, and encouraged violent behavior.  (Docket No. 45 ¶ 37).  Both the Code and the Social Media Policy are rife with warnings to BNY Mellon employees that the Company requires that they always do what's right, respect others, and must not expose the Company to any reputational harm.  (Docket Nos. 38-13; 44-17).  While "[a] violation of company policy can constitute a pretext for unlawful discrimination if others similarly situated also violated the policy with no adverse consequence," this Court has already determined that none of Ellis's purported comparators were similarly situated and that decision applies with equal force at this stage.  *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 322 (3d Cir. 2000).  Moreover, Ellis's post elicited a public outcry that forced BNY Mellon to defend its values to the general public unlike the posts of Manns and Reed. (Docket Nos. 38-9 at 15; 45 ¶¶ 16, 32).  Even the Chief Executive Officer and the Chief Human Resources Officer were contacted to account for her actions.  (Docket Nos. 44-2 at 6; 44-3 at 3; 45

¶¶ 28-30).

Lastly, the Court finds Ellis's own testimony persuasive in granting BNY Mellon's motion for summary judgment.  (Docket No. 38-4 at 4, 22-28).  She confirmed that she used "poor judgment," which was not respectful, and the post was subject to various interpretations, one of which encouraged violence.  (Docket No. 45 ¶ 41).  She also testified that during her three years with the Company with the exception of the decision to terminate her, she never felt like she was discriminated against or even heard race-related remarks.  (Docket No. 38-4 at 22-23, 24, 26).  Consistent with her testimony, the rest of the record is clear that Ellis's race was never mentioned during the July 2nd meeting that resulted in her termination.  (Docket No. 44-2 at 2).  In fact, one of the investigators, Galante, had no idea Ellis was white until he looked her up in the Company database the following day.  (Docket No. 38-8 at 14).  Thus, no reasonable jury could find BNY Mellon's reasons for terminating Ellis were pretextual.

VI.     CONCLUSION

Based on the foregoing, BNY Mellon's Motion for Summary Judgment is GRANTED.

An appropriate Order follows.


                                                    */s Nora Barry Fischer*
                                                    Nora Barry Fischer
                                                    Senior United States District Judge


Dated: May 20, 2020

cc/ecf: All counsel of record.